## CHARLES WARNER COMPANY v. INDEPENDENT PIER COMPANY.

## SAME v. S. S. "GULFTRADE."

Nos. 22 and 23. Argued October 10, 1928.—Decided November 19, 1928.

*Mr. Everett H. Brown, Jr.,* for petitioner.

*Mr. Howard M. Long* for respondent in No. 22.

*Mr. Chauncey I. Clark,* with whom *Mr. Frederic Conger* was on the brief, for respondent in No. 23.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

These two numbers on our docket present one cause in admiralty. It arose out of a collision between the single screw steamer Gulftrade—429 feet long, 59 foot beam—and two loaded scows which, with two others, were being towed by the tug Taurus upon hawsers astern. The flotilla was about 400 feet long. Both the tug and scows were owned or chartered by petitioner, Charles Warner Company. The Gulftrade was accompanied by the tugs Triton and Churchman, made fast to her port bow and port quarter. They were owned respectively by Independent Pier Company and Alfred E. Churchman. The Triton's master was upon the steamer and commanded the three associated vessels.

The accident occurred in the Schuylkill River near its confluence with the Delaware at 3: 00 P. M., October 1st, 1923. The weather was fair, tide flood, wind light.

Drawing her tow the Taurus passed slowly up the Delaware with the tide and rounded into the still water of the two hundred foot channel of the Schuylkill. The Gulftrade followed under her own power carrying with her the attending tugs, their engines motionless until

the last moment before the collision. Shortly after the flotillas entered the Schuylkill the Gulftrade for the third time, by a single blast, indicated her desire to pass to starboard—eastward. The Taurus (as she had done twice before while in the Delaware) gave an assenting blast. Attempting to pass in mid-channel, the steamer struck two of the scows and caused material loss.

The District Court found that "the set of the tide swung the tail of the tow to the eastward and more or less athwart the channel until it had straightened out. . . . . This, however, was a condition which the steamship was bound to anticipate and doubtless did. What happened was that the navigator of the ship expecting the tow would go to the westward and seeing it was so headed assumed it would be out of his way by the time he reached the passing point and that a passage up mid-channel would be clear. In this he miscalculated and hence the collision." It declared the steamer guilty of negligence; the Taurus without fault; and awarded full damages in favor of petitioner Charles Warner Company primarily against the Independent Pier Company, owner of the Triton, and secondarily against the Gulftrade.

The Circuit Court of Appeals held—"Under the circumstances the Taurus was in fault in giving consent to the Gulftrade to come ahead, relying too much on her ability to get out of the channel. Evidently the Taurus miscalculated the situation. So, also, it seems the Gulftrade was at fault. She was the following vessel. All she had to do was to hold back and not run into the scows. She certainly saw danger ahead when she gave the second signal and she certainly saw it more imminent when she gave the third signal. It was quite clear that she did go ahead and took an equal chance with the Taurus on the ability of the latter to give her free channelway to pass. The result was a needless collision."

We cannot conclude that the Taurus was in fault. She was prudently navigated in plain view of the Gulf-. trade who knew the relevant facts; and by assenting that the latter might pass she certainly did not assume responsibility for the maneuver. At most the Taurus obligated herself to hold her course and speed so far as practicable, to do nothing to thwart the overtaking vessel, and that she knew of no circumstances not open to the observation of the Gulftrade which would prevent the latter from going safely by, if prudently navigated. Of course no ship must ever lead another into a trap. There was ample room for the Gulftrade to pass. But if not, she should have slowed down and kept at a safe distance. Her fault was the direct and sole cause of the collision.

By the Act to adopt regulations for preventing collisions, etc., approved June 7, 1897, (c. 4, 30 Stat. 96, *et seq.*) it is provided—

"Art. 18, Rule VIII. When steam-vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam-whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam-whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam-whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel

ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel.

"Art. 23. Every steam-vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse.

"Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel."

Under these regulations the duty of the *Gulftrade* was clear. She should have anticipated the effect of the flood tide in the Delaware upon the flotillas as they rounded into the still water of the Schuylkill and kept herself out of the zone of evident danger.

In *Southern Pacific Co.* v. *Haglund* (*The Thoroughfare*), 277 U. S. 304, 310, we said—

" The *Relief* was not at fault in accepting the passing signal of the *Thoroughfare*. This was merely an assent to the proposed passage in the rear of the *Enterprise,* expressing an understanding of what the *Thoroughfare* proposed to do and an agreement not to endanger or thwart it by permitting an interfering change in the position of the *Enterprise.* See *Atlas Transp. Co.* v. *Lee Line Steamers* (C. C. A.), 235 Fed. 492, 495. And the *Relief,* being in a position to fully carry out its agreement, was under no obligation to decline the passing signal because of the approach of the *Union* on the other side and to sound instead a warning signal. There was nothing in the situation to indicate that the approach of the *Union* would prevent the *Thoroughfare* from passing safely, if, as the *Relief* had the right to assume, it were navigated with due care."

In *Atlas Transp. Co.* v. *Lee Line Steamers,* 235 Fed. 492, 495, the Circuit Court of Appeals (8th C. C. A.) had held—

" The reply of the Josh Cook to the passing signal of the Rees Lee was no more than an assent to it, at the risk of

the vessel proposing it. It expressed an understanding of what the Rees Lee proposed to do, and an agreement not to thwart it; but the success of the maneuver was at the risk of the Rees Lee."

*Whitridge* v. *Dill,* 23 How. 448, 453—

" The vessel astern, as a general rule, is bound to give way, or to adopt the necessary precautions to avoid a collision. That rule rests upon the principle that the vessel ahead, on that state of facts, has the sea-way before her, and is entitled to hold her position; and consequently the vessel coming up must keep out of the way."

*The Steamer Rhode Island,* Fed. Cas. 11,745—20 Fed. Cas. 646, 650—

" The approaching vessel, when she has command of her movements, takes upon herself the peril of determining whether a safe passage remains for her beside the one preceding her, and must bear the consequences of misjudgment in that respect."

See also *City of Baltimore,* 282 Fed. 490, 492; *The Pleiades,* 9 F. (2d) 804, 806.

Objections to the decree below were offered by counsel for respondents in their briefs and arguments here. But no application for certiorari was made in their behalf and we confine our consideration to errors assigned by the petitioner. *Steele* v. *Drummond,* 275 U. S. 199, 203; *Federal Trade Comm'n* v. *Pacific Paper Ass'n,* 273 U. S. 52, 66; *Webster Co.* v. *Splitdorf Co.,* 264 U. S. 463, 464; *Alice State Bank* v. *Houston Pasture Co.,* 247 U. S. 240, 242; *Hubbard* v. *Tod,* 171 U. S. 474, 494; *The Maria Martin,* 12 Wall. 31, 40.

The decree of the Circuit Court of Appeals is reversed and that of the District Court is affirmed. The cause will be remanded to the latter court for further proceedings in conformity with this opinion.

*Reversed.*